809 So.2d 702 (2001)
Ralph GILLESPIE and Doris Gillespie, Appellants,
v.
Benny Ray KELLY and Eleanor Jane Kelly, Appellees.
No. 2000-CA-00621-COA.
Court of Appeals of Mississippi.
October 2, 2001.
Rehearing Denied December 18, 2001.
Certiorari Denied March 7, 2002.
*703 Rodney Shands, New Albany, Attorney for Appellants.
Talmadge D. Littlejohn, New Albany, Attorney for Appellees.
Before KING, P.J., LEE, and BRIDGES, JJ.
BRIDGES, J., for the court:
¶ 1. This case comes from the Chancery Court of Union County, Honorable John C. Ross Jr. presiding. The chancellor found for the plaintiffs, the Kellys, granted them an easement by prescription across the Gillespies' land and the land of the Poplar Springs Baptist Church, and denied the Gillespies any relief on their cross claim of adverse possession. The Gillespies appeal this judgment, and come now to this Court bringing several issues:
1. WHETHER THE COURT ERRED IN ITS FINDING OF LAW THAT AN ADVERSE POSSESSION CLAIM CAN BE REACTIVATED THUS DELETING THE REQUIREMENT THAT THE ADVERSE USE BE CONTINUOUS AND UNINTERRUPTED FOR 10 YEARS.
2. WHETHER THE COURT ERRED IN ITS FINDINGS OF FACT THAT APPELLEE'S PREDECESSOR IN TITLE CLAIMED USE OF THE ROADWAY.
3. WHETHER THE COURT ERRED IN OTHER FINDINGS OF FACT CONSIDERING THE TESTIMONY AND EVIDENCE IN COURT, MUCH OF WHICH WAS UNCONTRADICTED.
4. WHETHER THE COURT ERRED IN NOT ADDRESSING THE ISSUE OF APPELLANT'S CROSS-CLAIM OF ADVERSE POSSESSION.
The Appellee has filed a motion to strike the Appellant's issues, and instead advances his own issue:

*704 1. WHETHER OR NOT THE APPELLEE'S WERE ENTITLED TO A PERMANENT EASEMENT BY PRESCRIPTION TO THE REAL PROPERTY OF THE APPELLANTS HEREIN AND THE DEACONS OF POPLAR SPRINGS BAPTIST CHURCH?
Finding error in part, we reverse in part and affirm in part.

STATEMENT OF THE FACTS
¶ 2. In 1953, Ralph Gillespie purchased a tract of land found in Union County from his wife's uncle, Frank Whitten. This land is situated along Union County road 207, also known as the Elliston Road. According to testimony, the land was completely enclosed by a fence. Gillespie testified he and Roy Starnes Jr. fixed the fence and built an entrance on the Union County side of the property for access to a public road. Gillespie claims there was no public road or any means of ingress across his property prior to this.
¶ 3. Within Gillespie's claimed property is a 1.2 acre tract of land which was owned by the Poplar Springs Baptist Church. This tract is found within Gillespie's lot, with its eastern and southern boundary touching Gillespie's lot and its outer northern and western edges running alongside a piece of property owned by the Kellys. The Kellys bought their lot from Billy Little, who had inherited the land from his father Wiley Little. Wiley Little bought the property from the Morton family. Gillespie stated there was no sign of the church at the time he purchased his land, or of any fences except for the old fence on the western and northern side of the lot which separated the lot from Kelly's property. Gillespie also testified he believed the church tract was included in his land.
¶ 4. Gillespie sold timber off his track in 1978 to Roger Langford of Langford Lumber Company. Langford changed the trail Gillespie had built. Langford constructed the current road, which began at the gate and ran in a northwesterly direction. The road then ran into the interior of the lot. Langford logged the property, including the church tract, and paid Gillespie for the lumber. Langford stated he saw no public means of ingress/egress into or across the property besides that which he built. Langford also testified he saw no sign of the church. Gillespie kept the gate to his land shut and began locking it in the 1980s. The only people who had keys were tenants and permissive users.
¶ 5. As stated earlier, Wiley Little owned the tract adjoining the church tract and Gillespie's land to the north. This is the property formerly owned by the Mortons, and now owned by the Kellys. This piece of property is land locked and has no access to county road 207. Gillespie claimed he gave Little permission to use a trail across his land once in order to transport barrel staves Little had cut off of his land. Gillespie testified Little did not use the road to access his lot, but another trail Gillespie had given him permission to use. Another time, in 1988, Little cut timber from his property and, according to Gillespie, sought permission to cross the church tract and Gillespie's lot to use the road to remove his timber. Gillespie allowed this usage of the road. In 1989, when Georgia Pacific Lumber was cutting the timber on Little's property, they accidentally crossed the property line and removed some trees from the church tract. Georgia Pacific paid Gillespie for the damages.
¶ 6. Wiley Little died and left his property to his son Billy Little. In 1993, Billy sold the land to the Kellys. Billy testified he did not represent to the Kellys they had any sort of easement allowing them access to their land from county road 207, and told them they would have to determine *705 from the land records whether they did or not. Billy testified at trial he remembered going out with his father to his father's land as a child, but he was not absolutely sure whether the road across Gillespie's land was the way they went.
¶ 7. The Kellys sought permission from Gillespie to use his road to cross his land, and he gave it to them. The Kellys also paid a deposit for a key. Gillespie claimed he and Kelly agreed that if Kelly decided to build a house, they would try and work out another way for the Kellys to access their land because Gillespie did not want a lot of traffic on his road.
¶ 8. In 1998, Kelly began building a home. Because a previous tenant failed to give him back the key, Gillespie had a new lock placed on the gate to his land. Gillespie did not give Kelly a new key. Kelly had the gate torn down and the road graveled. Gillespie had Kelly arrested for trespass, and Kelly then filed the present lawsuit. The Kellys claimed there had been a roadway running across Gillespie's land to the Poplar Springs Baptist Church and continuing onto the Morton house, and they were entitled to an easement by prescription. Numerous witnesses testified regarding whether there had been a roadway going across Gillespie's property to the church property and on to the Morton's house. They also testified regarding where the road to the church was located, and how long it had been since the church lot was in use. These witnesses offered varying stories regarding the physical location of the easement causing a great deal of confusion as to whether it truly existed or not. After a lengthy trial, the chancellor found for the Kellys, allowing an easement in their favor. During the appeal process, Kelly filed a motion to strike Gillespie's statement of the issues. This motion has yet to be ruled on, and Kelly raises it again in his brief.

STATEMENT OF THE LAW

STANDARD OF REVIEW
¶ 9. This Court has a limited standard of review in examining and considering the decisions of a chancellor. McNeil v. Hester, 753 So.2d 1057 (¶ 21) (Miss.2000). "The chancellor, as the trier of fact, evaluates the sufficiency of the proof based on the credibility of witnesses and the weight of their testimony." Fisher v. Fisher, 771 So.2d 364, 367 (Miss.2000) (citing Richard v. Richard, 711 So.2d 884, 888 (Miss.1998)). A chancellor's findings will not be disturbed upon review by this Court unless the chancellor was manifestly wrong, clearly erroneous, or applied the wrong legal standard. Bank of Mississippi v. Hollingsworth, 609 So.2d 422, 424 (Miss.1992). "The standard of review employed by this Court for review of a chancellor's decision is abuse of discretion." McNeil, 753 So.2d at 1063(¶ 21). The standard of review for questions of law is de novo. Consolidated Pipe & Supply Co. v. Colter, 735 So.2d 958, 961 (Miss.1999).

ANALYSIS
¶ 10. Before we begin our analysis of the issues in this case, it is necessary that we rule on Kelly's motion to strike. We hereby deny Kelly's motion to strike the Appellant's issues and substitute his own issue. We will therefore proceed with the analysis of Gillespie's four issues.

1. WHETHER THE COURT ERRED IN ITS FINDING OF LAW THAT AN ADVERSE POSSESSION CLAIM CAN BE REACTIVATED THUS DELETING THE REQUIREMENT THAT THE ADVERSE USE BE CONTINUOUS AND UNINTERRUPTED FOR 10 YEARS.
¶ 11. The Gillespies (hereinafter Gillespie) raise this issue in response to statements *706 the chancellor made in his order regarding the basis for his grant of an easement by prescription to the Kellys (hereinafter Kelly). The Gillespies refer to a place in the judgment where the chancellor states a factual basis for his opinion:
In this present case, the proof clearly establishes to the satisfaction of the Court that a roadway or easement existed beginning more than 50 years ago to the "Morton house" on the location of the real property of Benny Ray Kelly and Eleanor Jane Kelly presently own, and to the Poplar Springs Church, across the real property now owned by Ralph Gillespie and Jeff Gillespie.
The roadway was utilized actually, openly, peacefully and under claim of ownership for more than 10 years by all those residing in the "Morton house," or the old now extinct houses along the roadway, as well as by all those attending church at the Poplar Springs Church, until it was destroyed in 1944 or 1945. The roadway was likewise used by all of the predecessors in title to Benny Ray Kelly and Eleanor Jane Kelly to access their real property.
These facts lead to a section of the judgment where the chancellor states a legal basis for his findings:
It is true that the permissive use which Ralph Gillespie allowed Benny Ray Kelly to have for several years would disrupt this adverse use; however, the reclaim of adverse used by Benny Ray Kelly when he removed the gate in 1998, reactivated the adverse possession claim.
In citing these two sections, Gillespie argues the chancellor was in error for holding an adverse possession claim can be reactivated. Kelly responds to this argument by citing facts in the record he believes support the chancellor's finding, and also by pointing out the deference this Court is to grant the decisions of chancellors. After a lengthy review of the record, this Court finds the appellee's arguments amount to a great deal of sound and fury signifying nothing.
¶ 12. This Court has stated many times the standard it must follow in reviewing the findings of fact and conclusions of law made by chancellors, and does so again in the standard of review section laid out above. With this in mind, it goes without saying that reversing a chancellor's findings and holdings is something this Court approaches with much trepidation. However, in cases such as this, this Court often finds itself in a situation where it must reverse these decisions or else aid in an injustice and further perpetuate a wrongful view of the laws of this State. This being said, the analysis of this issue will deal with the chancellor's holding that an adverse possession claim can be reactivated, and since this is a finding of law we must engage in de novo review. Consolidated Pipe & Supply Co., 735 So.2d at 961.
¶ 13. In order to prove that a prescriptive easement exists, a party must prove that the use is (1) open, notorious and visible; (2) hostile; (3) under claim of ownership; (4) exclusive; (5) peaceful; and continuous and uninterrupted for ten years. Sharp v. White, 749 So.2d 41 (¶¶ 7 8)(Miss.1999). "However, use by express or implied permission or license, no matter how long continued, cannot ripen into an easement by prescription, since adverse use, as distinguished from permissive, is lacking." Id. at (¶ 8) (citing Patterson v. Harris, 239 Miss. 774, 125 So.2d 545 (1960)).
¶ 14. After a great deal of research, this Court has yet to find any case law in this State where an adverse possession claim has been deemed to be reactivated after a period of time in which use of property was had by permission. In fact, this Court has often found that permission *707 defeats adverse possession. Myers v. Blair, 611 So.2d 969, 971 (Miss. 1992). While this Court does recognize tacking of an adverse possession claim from one owner to the next in order to meet the necessary ten year period, this Court has never found that a claim of adverse possession may skip over several preceding owners who had possession or use by permission. Rutland v. Stewart, 630 So.2d 996, 999 (Miss.1994). It will surprise no one that this Court refuses to do so here. In this case, several of the predecessors in title had permission to use the roadway in question. This permission therefore prevents any previous claim of adverse possession from ripening. The ten year period of time required for a prescriptive easement must be continuous, and cannot be interrupted. Because of this, we hold the chancellor's conclusion that an adverse claim of an easement can be reactivated is in error. In addition, the testimony of Kelly's witnesses shows a great deal of confusion surrounding the actual physical location of the supposed easement. This calls into doubt whether the easement actually existed at all. For these reasons, we therefore reverse and render the chancellor's grant of an easement by prescription.

2. WHETHER THE COURT ERRED IN ITS FINDINGS OF FACT THAT APPELLEE'S PREDECESSOR IN TITLE CLAIMED USE OF THE ROADWAY.

3. WHETHER THE COURT ERRED IN OTHER FINDINGS OF FACT CONSIDERING THE TESTIMONY AND EVIDENCE IN COURT, MUCH OF WHICH WAS UNCONTRADICTED.
¶ 15. As both of these issues deal with findings of fact made by the chancellor, they have been combined here in the interest of avoiding repetition. As stated above in the standard of review, this Court gives a chancellor's findings of fact great deference, and will not disturb them unless the findings are clearly erroneous. Bank of Mississippi, 609 So.2d at 424.

A. The chancellor's finding Kelly's predecessors in title claimed usage of the roadway.
¶ 16. In raising this issue, Gillespie points out the chancellor found all of the predecessors in title had claimed use of the roadway. Gillespie then contrasts this finding with the testimony of Billy Little and the places where Little disclaimed any sort of ownership interest in any supposed easement. Kelly responds by trying to convince this Court Gillespie has misquoted Little, and then by pointing out the chancellor's findings of fact are to be granted great deference. While this is true, manifest error will cause this Court to disturb such findings. Bank of Mississippi, 609 So.2d at 424. Such is the case here.
¶ 17. This Court has several problems with the factual findings the chancellor made in deciding there was some ancient claim for adverse possession to which Kelly could somehow attach his claim. No evidence was presented concretely proving any predecessor in title to Kelly made any claim of adverse use to the property in question. Kelly's direct predecessor in title, Billy Little, made no such claim, and no evidence was presented proving Billy's father, Wiley Little, made any such claim. The Appellee would seem to argue that this Court should assume Wiley claimed a right to use the roadway simply because he used the roadway. This is simply not true. The only undisputed facts offered into evidence regarding Wiley Little's use of the roadway was offered by Ralph Gillespie. Gillespie stated he gave Wiley permission *708 to cross his property once in order to remove barrel staves and also to cut lumber in 1989. When there is undisputed evidence that is reasonable, this Court must accept it as true. A & F Properties, LLC, v. Lake Caroline, Inc., 775 So.2d 1276(¶ 11) (Miss.Ct.App.2000) (quoting Lucedale Veneer Co. v. Rogers, 211 Miss. 613, 635, 53 So.2d 69, 75 (1951)). Since it is undisputed that Gillespie gave Wiley permission to cross his land, it is reasonable to believe, and no evidence was offered showing Gillespie to be untrustworthy, then it must be accepted as true that Wiley Little had permission to use the roadway.
¶ 18. The next predecessor in title to the Kelly property is the Morton family: the owners of the much discussed "Morton House." First of all, no member of the Morton family testified during this trial, so there is no way for this Court or the lower court to directly know whether that family ever claimed an adverse use of any road over the church property or Gillespie's property. Since there was no direct evidence, Kelly resorted to parading various witnesses across the stand who testified to remembering such a house actually existed and that there might have been a road from the church to the house. It should be noted, none of these people claimed any sort of ownership or adverse interest in the land; all they testified to was at one time people had gone to the church and they crossed over Gillespie's land to get there. As stated earlier, the testimony of these witnesses depicts a great deal of confusion as to the actual location of the road or path used by the churchgoers, and whether the existing road was the path used by them. In addition, Gillespie testified the road Kelly claims was the path to the church was not built until 1978, and this testimony was supported by Roger Langford. Also, none of these witnesses testified that any member of the Morton family actually claimed any sort of ownership or adverse use of any roadway going from the county road to their lot. As is well known, claim of ownership is one of the necessary elements to prove adverse possession or easement by prescription. Sharp, 749 So.2d at (¶ 8). Since there is no concrete evidence proving a claim of ownership was actually made by any predecessor in title, then Kelly has nothing to decessor in title, then Kelly has nothing to tack his claim to.
¶ 19. Kelly does not meet the elements necessary for a prescriptive easement because his claim only became adverse after he tore the gate down. This was done in 1998 and therefore would not meet the ten years of continuous use requirement necessary to show a prescriptive easement. Even if Kelly had proven an actual claim of adverse use had been made by a predecessor in title and an easement had existed, the evidence in the record indicates any such easement appears to be abandoned. Also, the adverse possession of the church lot by Gillespie, which is dealt with in issue four, would also include any such easement.
¶ 20. This Court usually will allow a chancellor's finding of facts to stand. However, in cases like this one, where the findings of fact are clearly in error, this Court must set the facts out correctly. It is this Court's opinion that the chancellor was in error in finding there was any previous claim of adverse use or prescriptive easement and for finding Kelly reactivated such use. Therefore, this Court finds the chancellor's finding of facts to be in error. The evidence indicating any easement by prescription is neither clear nor convincing, therefore failing to meet the standard of proof required for adverse possession. Thus, we reverse and render as to this issue.

*709 B. Other findings of fact.
¶ 21. Gillespie brings forward for analysis several other findings made by the chancellor in his order and claims these findings are also in error. Gillespie calls into question findings the chancellor made about the testimony of almost everyone who testified during the trial. Kelly responds by again stressing the degree of deference a chancellor's findings of facts are given, and basically tries to answer the challenges Gillespie makes to their testimony. This Court believes addressing all of these findings is unnecessary. The issues in the case which are really determinative are those dealing with whether the chancellor was in error in granting the easement (and the means by which he arrived at that conclusion), and whether the chancellor should have granted Gillespie's claim of adverse possession of the church lot. Because of this, addressing each one of the errors Gillespie points out is unnecessary. However, this action should in no way be considered a lessening of the importance this Court places on the findings of fact chancellors should make in rendering judgments. Suffice it to say, the findings of fact contrary to this Court's opinion are in error.

4. WHETHER THE COURT ERRED IN NOT ADDRESSING THE ISSUE OF APPELLANT'S CROSS-CLAIM OF ADVERSE POSSESSION.
¶ 22. In this issue Gillespie claims the chancellor was in error for failing to address his adverse possession claim, and for failing to hold he had adversely possessed the church lot. Kelly argues Gillespie failed to properly plead adverse possession, and even if he did, Kelly claims Gillespie has failed to plead enough information to properly prove adverse possession. Gillespie's claim of adverse possession arises out of an affirmative defense cited in his answer to Kelly's complaint. Gillespie argues he did plead enough information for an affirmative defense, and that the evidence proved he had adversely possessed the land.
¶ 23. After a close review of the record, this Court must affirm the holding of the trial court, but not based on any of the arguments cited by the parties. In filing his complaint, Kelly served notice by publication on both Gillespie and the Deacons of Poplar Springs Baptist Church, in accordance with Rule 4(c)(4) Mississippi Rules of Civil Procedure. This was proven in the pleadings. However, when Gillespie filed his cross-complaint, he failed to give proper notice to the Deacons of Poplar Springs Baptist Church. According to Rule 5(a) of the Mississippi Rules of Civil Procedure, "[n]o service need be made on parties in default for failure to appear except that pleadings asserting new or additional claims for relief against them shall be served upon them in the manner provided in Rule 4 for service of summons." MRCP 5(a). Because of this, Gillespie failed to give proper notice to the Deacons of Poplar Springs Baptist Church, and thus his claim of adverse possession was not properly before the lower court. For this reason, it was not error for the chancellor to refuse to address the issue of Gillespie's adverse possession of the land.
¶ 24. This is not to say that Gillespie could not re-file a claim for adverse possession. The holding made above as to Kelly's claim stands. However, neither this Court nor the chancellor can properly address a claim when insufficient notice has been given. Thus, this Court affirms the chancellor's refusal to address the issue of Gillespie's adverse possession of the church lot.

CONCLUSION
¶ 25. The chancellor was in error for holding an adverse possession claim can be *710 reactivated and for granting Kelly an easement by prescription over Gillespie's property. The chancellor was further in error for holding Kelly's predecessors in title had claimed any usage of the roadway. Last, but definitely not least, the chancellor was not in error for failing to address the issue of adverse possession as proper notice was not given regarding the Gillespie's cross-claim. Therefore this Court reverses and renders the chancellor's grant of an easement to Kelly.
¶ 26. THE JUDGMENT OF THE UNION COUNTY CHANCERY COURT IS HEREBY REVERSED AND RENDERED REGARDING THE CHANCELLOR'S FINDING THAT AN ADVERSE POSSESSION CLAIM CAN BE REACTIVATED, REGARDING THE GRANT OF AN EASEMENT ACROSS GILLESPIE'S PROPERTY, REGARDING THE FINDING OF ANY PRIOR USE OF THE ROADWAY BY KELLY'S PREDECESSOR IN TITLE, AND AFFIRMED AS TO THE CHANCELLOR'S REFUSAL TO ADDRESS GILLESPIE'S CLAIM OF ADVERSE POSSESSION. COSTS OF THIS APPEAL ARE ASSESSED EQUALLY TO THE APPELLEES AND APPELLANTS.
KING P.J., THOMAS, LEE, IRVING, AND CHANDLER JJ., CONCUR.
SOUTHWICK, P.J., CONCURS WITH SEPARATE WRITTEN OPINION JOINED BY LEE, IRVING AND MYERS, JJ. McMILLIN, C.J. AND BRANTLEY, J., NOT PARTICIPATING.
SOUTHWICK, P.J., concurring:
¶ 27. I agree with the majority's analysis of the insufficiency of the evidence to support a prescriptive easement. However, I believe an improper explanation of certain legal principles has been joined with that analysis. Thus I write separately.
¶ 28. The majority finds that reversible error occurred when the chancellor relied on a "reactivation" of adverse possession. Disagreeing that two periods of adverse possession divided by permissive use can be joined, the majority declares that no easement exists. The conclusion about interruption of possession is correct as far as it goes, but it overlooks two critical points.
1) Once adverse possession has begun, the record title owner cannot stop the running of the period merely by granting permission. If that could occur, then one day from adverse possession's ripening into title, the record title owner could say "you have my permission" and prevent loss of the property. The law is settled that more than this is required.
2) Regardless of the time during which permissive use may have interrupted the continuity of the possession, it is alleged that adverse possession had prior to then already created title. Once adverse possession creates an easement, it cannot be lost by the record title owner granting permission. To be colloquial, the horse is well out of the barn by then.
¶ 29. As to the first point, a distinction is made in the law between use that begins with permission and use that begins as adverse but is alleged to have prematurely ended because of permission. The first principle is captured in this statement: "Mississippi cases hold that possession with the permission of the record owner can never ripen into adverse possession until there is a positive assertion of a right hostile to the record owner which is made known to him." Rice v. Pritchard, 611 So.2d 869, 872 (Miss.1992). Or as another decision phrased it, use that at its inception is with the permission of the record title owner cannot ripen into title by adverse possession unless a clear claim of *711 hostile ownership is made by the adverse user. Patterson v. Harris, 239 Miss. 774, 785, 125 So.2d 545, 550 (1960).
¶ 30. The rule is different when possession begins without any permission from the title owner. The Court said that it was ineffective for the title owner to stop the hostility of possession by saying "[f]rom now on, if you possess this property then you do so with my permission...." Rice v. Pritchard, 611 So.2d at 873. "Where another is asserting a claim of right and using a passageway under such claim, a party must do something more than merely verbally protest; there must be a physical interruption or a court proceeding or some unequivocable act of ownership which interrupts the exercise of the right claimed and being used by the opposite parties." Id., quoting Board of Educ. of Itawamba County Miss. v. Loague, 405 So.2d 122, 125-26 (Miss.1981). Though the latter quote refers to a "protest," the immediately previous excerpt from Rice made it plain that the same principle applies when the record title owner gives permission only after hostile use has begun.
¶ 31. The evidence regarding permission arises from events in 1993, while the chancellor found that the roadway had been used by Kelly's predecessors to access their property for over fifty years. Thus if the chancellor's findings are supportable, a prescriptive easement had long existed prior to the 1993 permission. The only question that these facts would then raise is whether someone who, through the adverse possession of others would have an easement, can forfeit that easement by failing to recognize his rights to it. The general principle is that once title has been acquired by adverse use, mere statements by the adverse user cannot divest the title that has been acquired. Trotter v. Gaddis & McLaurin, 452 So.2d 453, 458-59 (Miss. 1984). However, a distinction needs to be made between fee simple title and an easement acquired by adverse possession.
¶ 32. As to fee simple title, an "adverse occupant upon the completion of the statutory period [is vested] with a new and independent title to every estate in the land." Levy v. Campbell, 200 Miss. 721, 728, 28 So.2d 224, 226 (1946). That title can be lost only by proper transfer, such as deed, will, or intestacy, or by another period of possession ripening title in a new adverse user. Lowi v. David, 134 Miss. 296, 302, 98 So. 684, 685 (1924). Therefore if title has been acquired, it is not relinquished merely by the new owner's indicating a belief in the former owner's title. Such statements are, though, relevant to whether the possession has been hostile under a claim of right. Bonds v. Bonds, 226 Miss. 348, 359-60, 84 So.2d 397, 399-400 (1956).
¶ 33. The issue here, though, concerns a prescriptive easement. Kelly's land would be the dominant estate, which was benefitted by an easement acquired by possession over the servient estate owned by Gillespie. It is not necessary that the ten year period for adverse possession run before the easement can be lost. In fact, an easement can simply be abandoned.
Once the easement is properly created..., abandonment requires "protracted non-use for an extended period of time," which creates a "presumption of abandonment." R & S Development, Inc. v. Wilson, 534 So.2d 1008, 1010 (Miss. 1988). That presumption becomes stronger if there is an intent to abandon that is also shown. Id. One of the cases that the Mobleys cite emphasizes that intent to abandon an easement is the principal consideration. Columbus & Greenville Ry. Co. v. Dunn, 184 Miss. 706, 719-20, 185 So. 583 (1939).
*712 Bivens v. Mobley, 724 So.2d 458, 461-62 (Miss.Ct.App.1998).
¶ 34. The evidence is that beginning in 1993, Kelly sought Gillespie's permission to enter at the gate that blocked the right of way. Kelly denies that he sought permission to use the easement itself. The gate, according to Kelly, kept the general public from entering at the location onto Gillespie's land, but Kelly testified that he had the right to enter. He received permission to enter at the gate, paid a deposit and received a key. That continued for five years, a period that ended when Gillespie changed the lock on the gate. Kelly then had the gate removed. Gillespie testified that the gate was installed in 1954 and that before that time there was no entry onto the land at that location. He also said that Kelly's predecessor in title did not have a key to the gate and did not use the road. Gillespie testified that when Kelly bought the land in 1993, he asked for permission to enter at the gate because he wanted to build a house on his land. Gillespie testified that he was not willing to permit permanent use of the roadway but did allow initial use until something could be decided between them. Kelly's predecessor also testified and indicated that he was unclear what rights he had and never told Kelly that there was an easement that gave him access.
¶ 35. Kelly said he was just getting permission to have a key so he could enter at the gate, thereby using a right of way that he now says he always thought he had. Conversely, Gillespie testified that Kelly in 1993 recognized that he needed permission to use the roadway itself, not just to have a key to unlock the gate. The chancellor did not distinguish between the kinds of permission and found that there was permissive use that interrupted the adverse use. Then the chancellor found that in 1998 when Kelly had the gate removed, the adverse use was reactivated.
¶ 36. The issue that would need to be resolved if prior possession had already created the easement, is whether the five year period during which Kelly used the easement and had a key from Gillespie for the gate, in some fashion constituted an abandonment of his right to the easement and a recognition of Gillespie's superior title. As one of the cases cited in Bivens indicated, the question is one of intent. Id., citing Columbus & Greenville Ry. Co., 185 So. at 583. If Kelly was merely seeking to avoid confrontation with Gillespie over the gate, and indeed, Gillespie had the right to put a gate on his property even if Kelly had a private right of way that had to be honored, then there would have been no abandonment. However, if Kelly for five years failed to realize that he had a right of way that took precedence over Gillespie's wishes, then that might be an abandonment of his rights even though he kept using the easement. Whether use of an easement with permission can be an abandonment of the preexisting right to use without permission is an avoidable legal point in this case, for the reasons I state next.
¶ 37. Even though I find that the majority has improperly characterized the legal issue on permissive use, the problem arises of whether there was evidence to support the chancellor's findings that this easement had been acquired by prescription prior to 1993. If it had been acquired, then the issue of abandonment becomes relevant. The majority makes a persuasive explanation of the inadequacies of the evidence in the record. I agree that evidence that Kelly's predecessors claimed a right of way was too insubstantial to constitute sufficient evidence to prove prescriptive use. Gillespie never *713 had prescriptive rights; therefore the issue of abandonment never arises.
LEE, IRVING AND MYERS, JJ., JOIN THIS SEPARATE OPINION.