ROBERTS, J.,
for the Court:
¶ 1. This is an adverse-possession case that was initiated by Richard Dean in the Chancery Court of Jackson County against the interests of Katie Slade, Guy Jackson, and Flora Nichols Ragan in a parcel of land near Vancleave, Mississippi. Based upon the testimony and evidence admitted at trial, the chancellor found that Dean failed to prove that he had adversely possessed the property.
PROCEDURAL HISTORY
¶ 2. Dean filed a complaint for adverse possession on May 25, 2006, in the Chancery Court of Jackson County. The subject property in this case is approximately eighty acres of unimproved real estate located near Vancleave, Mississippi (Van-cleave Property). The Vancleave Property is also the subject of a complaint for partition of real property filed in the Chancery Court of Jackson County by Slade and Jackson on December 9, 2005. However, the partition suit was stayed pending the result of Dean’s adverse-possession claim.
¶ 3. The adverse-possession suit proceeded to trial on March 5, 2009. In addition to Dean, Slade and Jackson were also present. Ragan was not present, and her attendance was waived by counsel. Jan Dean (Jan), Dean’s mother, was also absent from the proceeding, but she had previously entered a waiver of process and entry of appearance. Following the testimony detailed below, and a personal visit to the Vancleave Property by the chancellor, the chancellor concluded in a March 25, 2009, final judgment that Dean failed to prove by clear and convincing evidence that he had adversely possessed the Van-cleave Property. Aggrieved by the chancellor’s judgment, Dean appeals.
*1232 FACTS
A. The Relevant History of Ownership of the Vancleave Property
¶ 4. To provide some context as to how this suit came to be, we will briefly describe the relevant history of the ownership of the Vancleave Property. The property was originally owned by Louise B. Cox (Louise) and L.E. Cox (L.E.), who were Dean’s great grandparents and Slade’s and Jackson’s grandparents. After L.E. passed away, Louise, by warranty deed dated August 9, 1960, conveyed the property to their children: Fanny Louise Voitier, Audury Nichols (Audury), and Garland Cox (Garland). The deed was silent as to the type of ownership it passed to the trio.
¶ 5. Prior to his death in approximately 1993, Garland conveyed via a warranty deed his one-third interest in the property to his daughter, Slade. In an “Order Establishing the Heirs-at-Law of Audury M. Nichols, A/K/A/ Audury C. Nichols Deceased” admitted into evidence at trial, the chancellor found that Jackson and William David Nichols (William), deceased, were the sole heirs-at-law of Audury. Further, in a similar order, the chancellor found that Ragan was the sole heir-at-law of Nichols. The disposition of Voitier’s one-third interest was less clear. Voitier’s daughter, Jan, was declared her only heir-at-law by an order dated May 2, 2006. However, Dean claimed that Voitier orally conveyed her interest in the property to him in 1993. Dean also claimed that Louise’s conveyance of the property was as joint tenants with rights of survivorship. Thus, because Voitier was the longest-surviving sibling, it was Dean’s position that as a result of his grandmother’s oral conveyance, he owned the entire property. Nevertheless, based upon the above orders, the chancellor found that record title ownership of the Vancleave Property was vested in the following manner: Slade possessed a one-third interest; Jan possessed a one-third interest; Jackson possessed a one-sixth interest; and Ragan possessed a one-sixth interest.
B. Relevant Testimony at Trial
¶ 6. Dean testified that he lived in Texas for most of the time pertinent to this appeal, and he moved to Vancleave, Mississippi, in approximately 2005. According to Dean, when Voitier gave the property to him in 1993, he started paying the property taxes. Additionally, Dean began visiting the Vancleave Property several times a year. Dean testified that he also posted signs containing his name and contact information, repaired any existing fences that needed it, and introduced himself as the property owner to the adjacent landowners. Dean continued these activities as the years passed. Additionally, Dean testified that over the years he had given permission to various individuals to use the property for hunting and recreational purposes. Dean stated that the individuals seeking permission contacted him with the information listed on the posted signs. Evidence of these discussions was admitted in the form of liability waivers and stipulations of many of the Vancleave Property’s surrounding property owners. Generally, the five stipulated testimonies stated that Dean was the assumed owner of the Vancleave Property because of Dean’s representations as such, from the presence of the posted signs, and Dean’s general actions and overall presence on the property since 1993.
¶ 7. As evidence of his control over the property, Dean testified that he was approached by an adjacent landowner in approximately 1994, 1995, or 1996, and asked if he would allow an easement through the property for utility lines. Without consulting Slade or Jackson, he declined the offer. *1233 However, several months later, Dean happened to be on the property when he noticed that a utility company was cutting timber to make way for power lines. Dean intervened. He informed them that he owned the property and that he did not approve the easement. Dean was eventually partially reimbursed for the damage to the property. There was no testimony that indicated Slade or Jackson were ever aware of these events.
¶ 8. Dean also testified that he had received several inquires into whether he was interested in selling the property. He testified that he declined all offers because he planned on building a home on the property.
¶ 9. Dean also testified that he had the ad valorem taxes on the property “changed over to [him]” in 1993. He further stated that: at some point, Slade had the taxes changed back to her; this back-and-forth occurred twice more; he finally changed it back to him in 1995; and he paid them through 2001. Dean testified that at some point between 1993 and 1994, he informed Slade that she did not have any ownership interest in the property.
¶ 10. Dean’s grandmother, Voitier, died in 2000, while she was living in Florida. Dean stated that she died intestate, and he had attempted to obtain title ownership. However, he was advised that because she died in Florida, the probate process would be expensive and time-consuming. Dean testified that he was told by the “tax office” to allow the taxes owed to become delinquent for a period of time and then buy the Vancleave Property at the eventual tax auction. He complied, failed to pay the 2002 and 2003 taxes due, and purchased the property without consulting either Jackson or Slade. Dean testified that no one else contributed to the taxes owed on the property from 1993 through the tax sale.
¶ 11. Dean testified that Garland and Voitier had an arrangement that Garland would actually pay the taxes, and Voitier would subsequently pay Garland her portion of the taxes due. Tax bills for several years that were admitted into evidence showed that the property was in the name of “Voitier Fannie Louise Et Al” for tax purposes during all times pertinent to this appeal. Dean’s name and address were listed as the billing address on each bill starting in 1995, which showed Slade’s name and address physically crossed out and Dean’s information written in. When asked about this, Dean stated: “I don’t know about the legal, but as far as I’m concerned, [the property was assessed in my name]; because I was the guy writing the check....” However, Dean’s attorney eventually stipulated that the property was assessed to Voitier.
¶ 12. Jackson was next to testify. During all pertinent times associated with this appeal, Jackson lived in Fairhope, Alabama. He testified that the last and only time he visited the Vancleave Property was in 1992, with Dean. Jackson testified that during his 1992 visit to the property, he did not see any improvements or posted signs. Jackson stated that he had between eight and ten conversations during the 1990s with Dean concerning selling Jackson’s interest or assisting in buying Slade’s interest in the property. Documents reflecting Jackson’s notations concerning conversations with Dean in 1997 and 1998 were admitted into evidence. Additionally, Jackson stated that he believed that he also had spoken with Dean in 2005, concerning the same issues. Jackson testified that Dean never sought his permission to post signs on the property, allow others on the property, or any other matter regarding the property. However, Jackson stated that in 1992, Dean mentioned that he was going to put up a fence.
*1234 ¶ 13. Jackson stated that although Dean would at times imply, or outright state, that he owned the entire property, the reason for the 1992 visit was to discuss buying out the other interest holders. Dean testified that he and Jackson might have talked about buying Slade’s interest, but he could not recall. Jackson disagreed with Dean’s claims of full ownership, and Jackson verbally informed Dean that Jackson and Slade also owned an interest in the property. Also, Jackson testified that after the 1992 visit to the property with Dean, the pair went to Jackson’s house; and Jackson showed Dean a copy of Audu-ry’s last will and testament indicating that Jackson had a partial, undivided interest in the property. Jackson testified that Dean “kept saying he owned it all. And [Jackson] didn’t pay any attention to him.” During rebuttal testimony, Dean stated that he did not recall going to Jackson’s home or seeing the will.
¶ 14. Jackson testified that he had not paid any taxes on the property since approximately 1993. However, Jackson stated that in 1997, Dean had contacted him and asked him to pay them, but Dean rescinded his request before Jackson could comply.
¶ 15. Slade testified that until 2006, she lived approximately ten to fifteen minutes from the property in Gautier, Mississippi. Since Slade’s father died in 1993, she and her husband would walk the property once or twice a year. Slade described the property as a wooded thicket with no permanent structures or permanent roads. Slade also testified that she never saw any posted signs, was not sure if it was completely fenced, and never saw anyone else during her walks.
¶ 16. Slade’s recollection was that her father had paid the taxes through the 60s, 70s, and 80s. Slade stated that she knew Jackson and Jan, but the only contact she had with Dean was via telephone conversations. Slade testified that Dean called her in 1994 and said that he had Voitier’s interest. Slade claimed that Dean asked if she would be interested in buying Jackson’s interest.
¶ 17. Slade testified that in 1995, she was contacted by a realtor and asked if she was interested in selling the property. Slade contacted Jackson, who also had expressed interest in selling, and Dean, who was not interested in selling. Slade testified that there was some discussion about dividing the property, but Dean did not want to do so.
¶ 18. Slade testified that the taxes had always been in the name “Fannie Louise Voitier, Et. Al.” She stated that when her father was in charge of paying them it came “care of’ or “attention” to him. Then in 1992, she changed it to “care of’ Slade. Slade testified that she believed this continued until 1995 or 1996, when Dean changed the billing address to his own. Slade testified that she called Dean to ask about the change, and Dean told her that he felt he should pay the taxes for awhile since her family had paid them for so long. Slade characterized the agreement reached with Dean as a “rotational thing” in which Dean would pay the taxes for a period of time, then Jackson, and then herself. However, there was no testimony that Jackson had any knowledge of this agreement. Slade testified that throughout the years she and Dean had spoken about the property approximately eight times. However, Dean testified on rebuttal that other than one time in the early 1990s, he had never spoken with Slade about the property. According to Dean, when Slade called him regarding a realtor contacting her, Dean told Slade that she had no legal interest in the property.
*1235 ¶ 19. In approximately 1996, 1997, or 1998, the property became delinquent in the payment of its taxes, and Slade called Dean to inquire about the delinquency. Slade testified that Dean stated that he would take care of it. Slade called once more concerning the tax payment, and the taxes were eventually paid. Years later, Slade discovered that Dean had again failed to pay the ad valorem taxes. However, in addition to not paying the 2002 and 2003 taxes on the property, Dean had also purchased the property at the resulting tax sale. Slade discovered that Dean had purchased the property because she was forced to redeem it in August 2005. Soon after Slade redeemed the property, she hired an attorney and filed a complaint to partition the Vancleave Property.
¶ 20. Slade testified that Dean routinely said that he, Slade, and Jackson had legal interests in the property. Additionally, Slade stated that Dean never said, or hinted, that he owned it all. However, during cross-examination, she stated that in the late 1990s, she and Dean had a conversation during which Dean stated that the property was his, and he could do with it what he wished.
DISCUSSION
¶ 21. This Court adheres to a limited standard of review of the decisions of a chancellor. Nichols v. Funderburk, 883 So.2d 554, 556 (¶ 7) (Miss.2004). We will reverse only when the chancellor’s determinations were manifestly wrong, clearly erroneous, or when the chancellor applied an incorrect legal standard. Id. A finding that the proof was insufficient to sustain a claim of adverse possession is a fact-finding that requires our application of the substantial evidence/manifest error test. Walker v. Murphree, 722 So.2d 1277, 1280 (¶ 15) (Miss.Ct.App.1998). If substantial evidence supports the chancellor’s fact-findings, this Court must affirm, even though we “might have found otherwise as an original matter.” Nichols, 883 So.2d at 556 (¶7). and where the chancellor has failed to make specific findings, we will assume that the chancellor resolved such issue in favor of the appellee. Id.
WHETHER THE TRIAL COURT ERRED IN FINDING THAT THE APPELLANT FAILED TO PROVE THAT HE DID NOT GAIN TITLE TO THE VANCLEAVE PROPERTY BY ADVERSE POSSESSION
¶ 22. Dean argues that the chancellor erred in finding that Dean failed to prove that he had gained title to the property by adverse possession. Mississippi Code Annotated section 15-1-13(1) (Rev.2003) provides the following:
Ten (10) years’ actual adverse possession by any person claiming to be the owner for that time of any land, uninterruptedly continued for ten (10) years by occupancy, descent, conveyance, or otherwise, in whatever way such occupancy may have commenced or continued, shall vest in every actual occupant or possessor of such land a full and complete title[.]
Thus, the party claiming adverse possession must prove by clear and convincing evidence that his/her possession was “(1) under claim of ownership; (2) actual or hostile; (3) open, notorious and visible; (4) continuous and uninterrupted for a period of ten years; (5) exclusive; and (6) peaceful.” Stringer v. Robinson, 760 So.2d 6, 9 (¶ 13) (Miss.Ct.App.1999) (citing Rice v. Pritchard, 611 So.2d 869, 871 (Miss.1992)). “The ultimate question is whether the pos-sessory acts relied upon by the would be adverse possessor are sufficient enough to place the record title holder on notice that the lands are under an adverse claim of ownership.” Id. (citing Johnson v. Black, *1236 469 So.2d 88, 90-91 (Miss.1985)). Clear and convincing evidence has been defined as follows:
that weight of proof which produces in the mind of the trier of fact a firm belief or conviction as to the truth of the allegations sought to be established, evidence so clear, direct and weighty and convincing as to enable the fact[-]finder to come to a clear conviction, without hesitancy, of the truth of the precise facts of the case.
Moran v. Fairley, 919 So.2d 969, 975 (¶ 24) (Miss.Ct.App.2005) (quoting Travelhost, Inc. v. Blandford, 68 F.3d 958, 960 (5th Cir.1995)). “Clear and convincing evidence is such a high standard [of proof] that even the overwhelming weight of the evidence does not rise to the same level.” Id. (citing In re C.B., 574 So.2d 1869, 1375 (Miss.1990)).
A. Actual or Hostile
¶23. “Actual possession is ‘effective control over a definite area of land, evidenced by things visible to the eye or perceptible to the senses.’ ” Warehousing Mgmt, LLC v. Haywood Props., LP, 978 So.2d 684, 688 (¶20) (Miss.Ct.App.2008) (quoting Wicker v. Harvey, 937 So.2d 983, 993-94 (¶ 34) (Miss.Ct.App.2006)). The adverse possessor must hold the property without the permission of the true title owner since “permission defeats adverse possession.” Gillespie v. Kelly, 809 So.2d 702, 706-07 (¶ 14) (Miss.Ct.App.2001) (citing Myers v. Blair, 611 So.2d 969, 971 (Miss.1992)). “Adverse use is defined as such a use of the property as the owner himself would exercise, disregarding the claims of others entirely, asking permission from no one, and using the property under a claim of right.” Peagler v. Measells, 743 So.2d 389, 391 (Miss.Ct.App.1999) (quoting Cummins v. Dumas, 147 Miss. 215, 113 So. 332, 334 (1927)).
¶24. Dean argues that the chancellor should have found in his favor on this element because of the following reasons: he proclaimed his sole ownership of the property to Jackson and Slade; he posted signs on the property; he repaired the barbed-wire fence on the property; he changed the property-tax mailing address and paid the taxes for the property; and he gave others permission to use the property. However, given the facts of this case, we cannot find that the chancellor erred.
¶ 25. Although there was some contradiction as to the exacts dates, it is uncontested in the record that Dean changed the mailing address for the ad valorem taxes to his Texas address. It is further undisputed that when Slade became aware of the change, she contacted the Jackson County Tax Assessor’s Office and had the mailing address changed back to her address. Although disputed by Dean, when Slade changed the mailing address, she contacted Dean concerning his actions. According to Slade, Dean stated that he felt that he should pay the taxes since her family had paid them for so long. Additionally, Slade testified that they established a rotational responsibility for paying the taxes. Although there was some inconsistency in her testimony as to whether Dean had ever expressed his position of sole ownership over the property, we find that Jackson’s testimony, concerning Dean’s telephone call with regard to assisting in payment of the taxes due in 1997, corroborates Slade’s testimony that she contacted him during that approximate time period and expressed her concern over the past-due taxes. This also lends credence to Slade’s account of the rotational agreement. In any event, absent a finding of an abuse of discretion or manifest error, which we do not find, a chancellor is the sole judge of the credibility of witnesses and the weight to give to the evi *1237 dence. Webb v. Drewrey, 4 So.3d 1078, 1081 (¶ 11) (Miss.Ct.App.2009).
¶ 26. Given our holding that the chancellor did not err in the implicit Ending that there was an agreement between Slade and Dean concerning the payment of taxes, Dean’s argument that there was an adverse or hostile taking must fail. Although it was established that Dean did not have any ownership rights in the property, the testimony of Jackson and Slade established that, at times, Dean held himself out to be a co-tenant, and Jackson and Slade believed him to be a co-tenant. Further, Dean’s several discussions since 1995, concerning purchasing the other co-tenants’ interests in the property, further established Dean’s position as a co-tenant in the eyes of Jackson and Slade. Eddy v. Clayton, 44 So.2d 395, 397 (Miss.1950). Additionally, Dean’s attempt to obtain title to the Vancleave Property though a tax sale tends to indicate that he recognized that Slade, Jackson, and possibly others had an ownership interest in the Vancleave Property. Therefore, his actions concerning the property, whether known to Jackson and Slade or not, could not be viewed as more than the acts of a perceived co-tenant in furtherance of what was thought to be joint ownership.
B. Open, Notorious, and Visible
¶ 27. With respect to this element, the chancellor found “that there were no acts to put the record title owners on notice of [Dean’s] adverse possession.” Dean argues that the chancellor erred by failing to find in his favor on this element of adverse possession. Additionally, Dean claims that the chancellor should have found that the property was “wild lands,” which requires a lower quality of actions with regard to a claim of adverse possession. Walker, 722 So.2d at 1281 (¶ 16). In support of his argument, Dean states that his actions of granting permission to various individuals to use the property, preventing encroachments on the property, unilaterally refusing offers to purchase the property, and informing Jackson and Slade that he was the sole owner of the property constitute sufficient evidence to show that his possession of the property was open, notorious, and visible.
¶ 28. The mere possession of land is not sufficient to satisfy the requirement that the adverse possessor’s use be open, notorious, and visible. Wicker, 937 So.2d at 994 (¶ 35) (citing Craft v. Thompson, 405 So.2d 128, 130 (Miss.1981)). A claim of adverse possession cannot begin unless the landowner has actual or constructive knowledge that there is an adverse claim against his property. Scrivener v. Johnson, 861 So.2d 1057, 1059 (¶ 6) (Miss.Ct.App.2003) (citing People’s Realty & Dev. Corp. v. Sullivan, 336 So.2d 1304, 1305 (Miss.1976)). “[A]n adverse possessor ‘must unfurl his flag on the land, and keep it flying, so that the (actual) owner may see, and if he will, [know] that an enemy has invaded his domains, and planted the standard of conquest.’ ” Wicker, 937 So.2d at 994 (¶ 35) (citing Blankinship v. Payton, 605 So.2d 817, 820 (Miss.1992)).
¶29. Based on our discussion above concerning actual or hostile possession, we cannot say that the chancellor erred. A determination as to whether the property could be classified as “wild lands” aside, given Dean’s illusory position as a co-tenant, none of his actions would have given the record title holders notice that he was attempting to adversely possess the property.
¶ 30. As a result of our findings that the chancellor did not abuse her discretion when she determined that Dean did not prove the preceding two elements of adverse possession by clear and convincing evidence, we find that further discussion is *1238 not warranted. Dean was required to demonstrate by clear and convincing evidence that each of the elements of adverse possession were met. The chancellor weighed the conflicting testimony against Dean, and there is substantial evidence to support her decision. Accordingly, we find this issue without merit and affirm the chancellor’s judgment.
¶ 31. THE JUDGMENT OF THE CHANCERY COURT OF JACKSON COUNTY IS AFFIRMED. ALL COSTS OF THIS APPEAL ARE ASSESSED TO THE APPELLANT.
KING, C.J., LEE AND MYERS, P.JJ., IRVING, GRIFFIS, BARNES, ISHEE, CARLTON AND MAXWELL, JJ., CONCUR.