# IN THE COURT OF APPEALS OF THE STATE OF MISSISSIPPI

## NO. 2015-CA-01603-COA

| | |
|---|---|
| **CHARLES E. STASHER AND SARAH EULA STASHER** | **APPELLANTS** |
| **v.** | |
| **PATRICIA ANN PERRY, EXECUTRIX OF THE ESTATE OF RANDY ARCHIE SPRINGER, DECEASED** | **APPELLEE** |

| | |
|---|---|
| DATE OF JUDGMENT: | 07/15/2015 |
| TRIAL JUDGE: | HON. CYNTHIA L. BREWER |
| COURT FROM WHICH APPEALED: | MADISON COUNTY CHANCERY COURT |
| ATTORNEY FOR APPELLANTS: | SANDRA STASHER |
| ATTORNEY FOR APPELLEE: | JAMES M. CREWS III |
| NATURE OF THE CASE: | CIVIL - REAL PROPERTY |
| TRIAL COURT DISPOSITION: | GRANTED APPELLEE'S COMPLAINT FOR ADVERSE POSSESSION AND TO CONFIRM AND QUIET TITLE; DENIED APPELLANTS' ANSWER AND COUNTERCLAIM TO REMOVE CLOUD ON TITLE AND TO QUIET AND CONFIRM TITLE BY ADVERSE POSSESSION |
| DISPOSITION: | AFFIRMED: 02/14/2017 |
| MOTION FOR REHEARING FILED: | |
| MANDATE ISSUED: | |

**BEFORE GRIFFIS, P.J., BARNES AND CARLTON, JJ.**

**GRIFFIS, P.J., FOR THE COURT:**

¶1.     The Chancery Court of Madison County granted Randy Archie Springer's complaint for adverse possession and to confirm and quiet title and denied Charles E. Stasher and Sarah Eula Stasher's counterclaim to remove cloud on title and to quiet and confirm title by adverse

possession.[1]  The Stashers now appeal.  We find no error and affirm.

## FACTS AND PROCEDURAL HISTORY

¶2.     On April 28, 1983, Fulton Cannon executed a warranty deed to Charles and Sarah Stasher, which conveyed certain real property located in Madison County, Mississippi.  The Stashers used proceeds from a Farmers Home Administration loan to purchase the property.  Because the Stashers intended to run cattle on the property, they were required to fence in the property as a condition of the loan.  The Stashers did not obtain a boundary survey.  Instead, the Stashers met with Cannon, who pointed out the line where the Stashers should place the fence.  The fence was built shortly after the Stashers purchased the property.

¶3.     From 1983 to 1992, Cannon and the Stashers were neighbors.  In 1992, following the death of Cannon, Cannon's wife, along with others, conveyed their interest in the Cannon property to John Wilson.  Following Wilson's death, the property was devised to Ben Wilson, Stephen Wilson, and Gregory Wilson by Last Will and Testament dated December 10, 1992.

¶4.     On February 22, 2005, Stephen Wilson executed a warranty deed, which conveyed to Randy Archie Springer an undivided 83.34% interest in the property.  On October 26, 2006, Rosa Lee Milton executed a warranty deed, which conveyed to Springer the remaining 16.66% undivided interest in the property.

¶5.     The Springer property adjoins and is immediately east of the Stasher property.  The fence built by the Stashers in 1983 was actually constructed east of and parallel to the true

---

[1] Randy Archer Springer died September 25, 2015.  By order entered July 6, 2016, Patricia Ann Perry, executrix of the estate of Randy Archie Springer, was substituted as the Appellee in this matter.

west line of the Stasher property. As a result, the fence is located on property formerly owned by Cannon but, through the previously described conveyances, is now owned by Springer.

¶6. The land in dispute is located on the west side of the Springer property, immediately east of the east line of the Stasher property. This disputed property is approximately 3,332 feet long and 30 feet wide, and comprises approximately 2.29 acres. It is undisputed that Springer is the legal owner of and has record title to the disputed property.

¶7. On August 1, 2007, Springer filed a Complaint for Adverse Possession and to Confirm and Quiet Title. On September 4, 2007, the Stashers filed an Answer and Counterclaim to Remove Cloud on Title and to Quiet and Confirm Title by Adverse Possession. On March 17, 2015, a bench trial was held before the Chancery Court of Madison County, during which all parties appeared and were represented by counsel.

¶8. On July 15, 2015, the chancery court entered its opinion and final judgment wherein it granted Springer's complaint, denied the Stashers' counterclaim, found Springer to be the exclusive owner of the disputed property, and confirmed and quieted title in Springer. The Stashers filed a motion for reconsideration, amendment of findings of fact and conclusions of law, and entry of a new final judgment, which the chancery court denied.

¶9. The Stashers now appeal and argue: (1) the chancery court erred in finding Cannon gave the Stashers permission to construct a fence and, as a result, the Stashers cannot claim adverse possession for the time period that Cannon owned the property, (2) the chancery court erred in finding that, by 2003, the fence was no longer in good repair, sufficient to put

John Wilson and his predecessor in title, Stephen Wilson, on notice of the Stashers' claim of ownership, and (3) the chancery court erred in finding Springer held himself out as the owner of the property in such a way that Springer's and his predecessors' claims were sufficient to establish open, notorious, visible, exclusive, continuous, and uninterrupted possession of the land for the statutory ten-year period.

STANDARD OF REVIEW

¶10.    "[O]ur appellate review of the chancellor's decision is limited." *Apperson v. White*, 950 So. 2d 1113, 1116 (¶4) (Miss. Ct. App. 2007). We "will not disturb the findings of a chancellor when supported by substantial evidence unless the chancellor abused his discretion, was manifestly wrong, clearly erroneous, or an erroneous legal standard was applied." *Id*.

ANALYSIS

¶11.    Adverse possession requires the claimant to prove that his possession or occupancy was: (1) under claim of ownership, (2) actual and hostile, (3) open, notorious, and visible, (4) continuous and uninterrupted for a period of ten years, (5) exclusive, and (6) peaceful. *Rice v. Pritchard*, 611 So. 2d 869, 871 (Miss. 1992). To succeed on a claim of adverse possession, the claimant must prove each of the elements by clear and convincing evidence. *Id*.

> I.    *Whether the chancery court erred in finding Cannon gave the Stashers permission to construct the fence and, as a result, the Stashers cannot claim adverse possession for the time period that Cannon owned the property*.

¶12.    The first issue we must address is whether the Stashers established adverse possession

of the disputed property during the years of Cannon's ownership, 1983-1992. The existence of a fence "is one of the strongest indications of adverse possession." *Roy v. Kayser*, 501 So. 2d 1110, 1112 (Miss. 1987). However, "the mere existence of a fence near the actual boundary line does not establish that the fence is the accepted boundary between the parties." *Ellison v. Meek*, 820 So. 2d 730, 735 (¶16) (Miss. 2002). "The adverse possessor must hold the property without the permission of the true title owner since 'permission defeats adverse possession.'" *Apperson*, 950 So. 2d at 1118 (¶12) (citing *Gillespie v. Kelly*, 809 So. 2d 702, 706-07 (¶14) (Miss. Ct. App. 2001)).

¶13. At trial, Charles Stasher admitted the fence was constructed in its location with Cannon's permission. Specifically, Charles testified as follows:

> Q. And as a part of your financing for that property, you were supposed to put a fence along that line; isn't that right?
>
> A. That's right. Yes, sir.
>
> Q. Okay. And you put that fence in with Mr. Cannon's permission and at his direction?
>
> A. Yes, sir. He was right there with us.
>
> Q. Okay. You didn't take it on yourself to figure out where it was?
>
> A. No, sir.
>
> Q. He allowed you to put it there?
>
> A. Yes, sir.
>
> Q. And it was all done with his consent.
>
> A. Yes, sir.

Charles acknowledged that Cannon continued to reside on what later became the Springer property, and that Cannon continued to own what Springer ultimately purchased.

¶14. Moreover, Charles admitted he did not intend and was not trying to take any more land from Cannon than what was described in the deed. Charles testified that Cannon was to retain whatever property he had left following the transaction. Charles acknowledged that the property Cannon retained was later sold to Springer.

¶15. Charles's wife, Sarah, also testified at trial but denied the fence was built with permission. However, Sarah acknowledged that Cannon selected the location of the fence and that Cannon continued to own the land that Springer later purchased. Additionally, James White, a friend of the Stashers and the person who built the fence, testified that he "put the fence exactly where [Cannon] told us to put the fence."

¶16. The chancellor found the Stashers "had permission to build the fence on the disputed property, and thus cannot claim adverse possession for the time period that Fulton Cannon owned Mr. Springer's property." We find the chancellor's findings are supported by the record.

¶17. The Stashers assert that even if Cannon gave them permission to build the fence, there is no evidence that Cannon gave them permission to use the disputed property. However, the record reflects the Stashers occupied and held the disputed property by permission of Cannon.

¶18. Because the Stashers failed to show their possession or occupancy of the disputed property was adverse or hostile, the chancellor did not err in finding that the Stashers cannot

6

claim adverse possession from 1983-1992.

> II. *Whether the chancery court erred in finding that, by 2003, the fence was no longer in good repair, sufficient to put John Wilson and his successors on notice of the Stashers' claim of ownership.*

¶19. The next issue for our consideration is whether the Stashers established adverse possession of the disputed property during the years of the Wilsons' ownership, 1992-2005. "If a fence encloses the property for ten years, under a claim of adverse possession, title vests in the claimant and possessor, even though the fence was subsequently removed or fell into disrepair." *Roy*, 501 So. 2d at 1112. Regardless of whether the fence remains standing at the time of filing suit, the court must determine "whether the inclosure, like other acts of possession, is sufficient to fly the flag over the land and put the true owner upon notice that his land is held under an adverse claim of ownership." *Snowden & McSweeny Co. v. Hanley*, 195 Miss. 682, 687, 16 So. 2d 24, 25 (1943).

¶20. Sarah testified the fence "wasn't perfect." Sarah further testified regarding the condition of the fence:

Q. There were places where trees had fallen across it —

A. Probably was.

Q. [A]nd wire was down.

A. Uh-huh.

Q. Right?

A. Still now when the wind blows, trees blow down.

Q. Okay. Obviously, if you don't go back and move the fallen trees and replace the wire, it just stays down.

7

A.      Uh-huh.

Q.      And it's no good —

A.      Yes, sir.

Q.      And it's no good to hold cows in or keep them out, is it?

A.      No.  At that time it wasn't no cows in it.

¶21.    Sarah specifically acknowledged that by the time the fence was no longer good to hold cows in or keep them out, there were no longer cows on the property.  Sarah previously testified that the Stashers ran cows on the property until 1998.  Additionally, Sarah testified that before 2002, Charles "got down in his hip" and they decided "to just let the timber grow [s]o . . . the fence wouldn't just have to be perfect."

¶22.    The chancellor found that, by 2003, the fence was no longer in good repair sufficient to put the Wilsons on notice of the Stashers' claim of ownership.  The testimony supports the chancellor's findings.

¶23.    The Stashers claim that in addition to the construction of the fence, they exerted other acts of possession over the disputed property.  Specifically, the Stashers assert they ran cattle, planted grass, hunted, and cut timber on the property.  However, we find these acts do not amount to adverse possession.

¶24.    Although the testimony indicates the Stashers ran cows and planted grass on the property until 1998, neither act was continuous and uninterrupted for a period of ten years.[2]

_____

[2] Although it is unclear from the testimony how many years the Stashers planted grass, Charles testified he planted grass every winter in the pastures and that the cows wanted grass.  Thus, it appears the Stashers planted grass for the cows, which ran on the property until 1998.  Moreover, in their reply brief, the Stashers admit they "ran cattle and

8

Additionally, Charles acknowledged the cows did not graze all the way to the fence due to "pine straw and stuff." As a result, any claim for adverse possession based on the running of cows or the planting of grass is insufficient.

¶25. Although there is evidence the Stashers cut timber on the property, there is no indication how often this occurred. As the chancellor properly noted, "sporadic or occasional pasturing of cows and cutting of timber is insufficient to support a claim of adverse possession." *Apperson,* 950 So. 2d at 1116 (¶6).

> III. *Whether the chancery court erred in finding Springer held himself out as the owner of the property in such a way that Springer's and his predecessors' claims were sufficient to establish open, notorious, visible, exclusive, continuous, and uninterrupted possession of the land for the statutory ten-year period.*

¶26. The last issue for our determination is whether the activities of Springer and his predecessors established Springer's claim of ownership by adverse possession. Importantly, at trial, the parties stipulated that their respective deraignments of title had been admitted in the pleadings. There has been no issue raised that the legal descriptions of the Springer and Stasher tracts overlap. Thus, as the chancellor properly noted, the parties are the record owners of the lands described in their respective title deeds. Additionally, the Stashers admitted in their counterclaim that Springer is vested with record title to the disputed property. It is arguably unnecessary that Springer prove adverse possession of property to which he holds legal title. Nevertheless, we find the chancellor properly determined that Springer met his burden of proof.

planted grass on the property from 1983 until 1998."

9

¶27. The Stashers argue "[t]he only act of possession on the disputed property by Springer's predecessors in title was that of paying taxes on the disputed property." It is undisputed that the Wilsons paid taxes on the disputed property from 1992 to 2005. While the payment of property taxes does not conclusively establish ownership, it is an important factor to consider. *See Apperson,* 950 So. 2d at 1116 (¶6) (finding "the payment of property taxes is but one factor for the chancellor to consider, and is not conclusive of ownership"); *Geoghegan v. Krauss*, 228 Miss. 231, 242, 87 So. 2d 461, 465 (1956) (finding the payment of taxes is a "very weighty fact" in support of title).

¶28. However, the payment of property taxes was not the only act of possession exerted by the Wilsons. Ben Wilson testified that shortly after his father purchased the property in 1992, he visited the property with a survey crew for the purpose of locating the property corners, including the northwest and southwest corners, which correspond to the northwest and southwest corners of the disputed property. After locating the corners, Ben marked each corner with a six and one-half foot, yellow-painted metal "T-post." Both posts were visible in 1992, and the northwest-corner post remained visible in 2005. Ben testified he marked the corners of the property to identify the boundary line. Ben further testified that Charles was present when he installed the T-posts.

¶29. Following his purchase of the property in 2005, Springer paid the property taxes. Additionally, Springer posted the property, cut firewood, conducted wildlife management, and planted food plots for deer.

¶30. We find the chancellor did not err in finding Springer's and his predecessors' actions

10

were sufficient to establish adverse possession.

CONCLUSION

¶31.    "In a bench trial, the chancellor is the finder of fact and, thus, solely determines the credibility of witnesses and the weight to give to the evidence." *Segrest v. Starnes*, 143 So. 3d 628, 633 (¶24) (Miss. Ct. App. 2014).  We "cannot reweigh the evidence and must defer to the chancellor's findings of the facts, so long as they are supported by substantial evidence." *Hall v. Hall*, 134 So. 3d 822, 828 (¶21) (Miss. Ct. App. 2014).

¶32.    We find the chancellor's findings are supported by substantial evidence.  We do not find the chancellor abused her discretion, or was manifestly wrong or clearly erroneous. Thus, we affirm.

¶33.    **THE JUDGMENT OF THE MADISON COUNTY CHANCERY COURT IS AFFIRMED.    ALL  COSTS  OF  THIS  APPEAL  ARE  ASSESSED  TO  THE APPELLANTS.**

**    LEE, C.J., BARNES, ISHEE, CARLTON, FAIR, WILSON AND GREENLEE, JJ.,  CONCUR.    IRVING,  P.J.,  DISSENTS  WITHOUT  SEPARATE  WRITTEN OPINION.  WESTBROOKS, J., NOT PARTICIPATING.**